Darlene NORRIS, Appellant,

v.

Wende GATTS, Appellee.

No. S–1555.

Supreme Court of Alaska.

June 5, 1987.

Dennis M. Mestas, Mestas & Schneider, Anchorage, for appellant.

Paul A. Barrett and Michael P. McConahy, Call, Barrett & Burbank, Fairbanks, for appellee.

## OPINION

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

COMPTON, Justice.

This appeal is from a jury verdict and the award of costs and attorney's fees for the defendant Wende Gatts (Gatts). The case arises out of an automobile/motorcycle collision. For the reasons that follow, we affirm the judgment entered on the verdict and the award of attorney's fees and costs, with the exception that we remand the issue of expert witness fees to the trial court for recalculation in accordance with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Norris and Gatts were present at Chena Hot Springs Resort as part of an outing of "The Blue Knights" motorcycle club. Gatts drove her 1983 Audi 5000 automobile and Norris her motorcycle. Gatts and two others got into the Audi to follow the motorcycle club out of the parking lot. Gatts shifted the Audi from "park" into "drive" and attempted to pull out of the parking lot. At that point the vehicle accelerated uncontrollably. Gatts swerved but nevertheless struck Norris' motorcycle from the rear. The Audi finally halted when it hit a mound of dirt. Norris was thrown to the ground.

At trial, Norris contended that the only way the Audi could have accelerated was by Gatts pushing on the gas pedal. Gatts contended that when the Audi accelerated forward she began pumping the brakes but the brakes failed to halt it. Ms. Rush, a witness sitting in the front seat with Gatts, testified that when Gatts put the Audi in gear it just shot forward, and that Gatts was maneuvering the Audi as well as she could, stepping on the brakes as hard as she could. Rush also testified that at times she saw that Gatts had both feet on the brake pedal. Another witness to the accident, Mr. Rudolph, testified that he could not recall seeing the brake lights of Gatts' vehicle come on.

The Audi was examined at the scene and no defects were observed. Later, it was examined by a number of people including an Audi representative, Hans Gelke. No defects were found.

Both parties introduced expert testimony at trial. Norris called Gelke, who had examined Gatts' car while an employee of Audi. He testified that, based on his training, his experience testing cars, and 30 years experience with the Volkswagen (Audi) organization, it was all but impossible for an Audi 5000 to exhibit unwanted acceleration. He further testified that in any event, the Audi's brakes were more than adequate to stop the vehicle in a runaway situation.

On cross-examination, Gatts asked Gelke about the extent of his knowledge of unwanted acceleration and brake inadequacy. Gatts asked whether Gelke knew of the existence of consumer complaint reports of Audi runaways made to Audi and the National Highway Traffic Safety Agency (NHTSA) similar to that allegedly experienced by Gatts. Gelke was largely unaware of the reports.

Gatts introduced the expert testimony of William Rosenbluth. The trial court qualified him as an expert regarding the phenomenon of unwanted acceleration. Rosenbluth was retained to determine wheth-

er Audi 5000 vehicles had potential for unwanted acceleration. Based upon his research and testing of an Audi 5000 similar to the Gatts vehicle, Rosenbluth concluded that there were several potential causes for unwanted acceleration in such vehicles. Rosenbluth also testified that, under conditions of engine runaway as experienced by Gatts, the brakes on the Audi 5000 were inadequate to stop the car. Indeed, Rosenbluth had succeeded in inducing an engine runaway in a 1983 Audi 5000 identical to the Gatts vehicle and had confirmed that, under those conditions, the brakes would not stop the car. He testified that when the engine is running at a high speed, repeated pumping of the brakes actually decreases their effectiveness due to loss of vacuum pressure.

Rosenbluth determined that 128 incidents of unwanted acceleration of Audi 5000 vehicles had been reported to the NHTSA and the Center for Auto Safety as of a date shortly before he testified and that these reports were similar to Gatts' report of her experience.

Norris objected many times to the use of these consumer reports on grounds that these materials were unauthenticated, lacked foundation, were prejudicial, were not revealed in discovery and were hearsay. These materials were not admitted into evidence, yet they were disclosed to the jury when utilized by Gatts during the Gelke cross-examination and were projected onto the wall by overhead projector as aids to Rosenbluth's direct testimony. The court gave a limiting instruction regarding these materials at the time of their disclosure.

Rosenbluth also showed the jury a videotaped simulation of the runaway he induced in an Audi 5000, to which Norris objected on grounds that it was an inaccurate re-enactment. The court gave a limiting instruction on this as well.

Gatts also introduced the videotaped deposition testimony of Dr. Michael Eaton. Eaton was a physician hired by Norris for a second opinion. Thereafter Eaton was used by Gatts as an expert witness. Eaton received a complete set of Norris' medical records, X-rays and test results from both before and after his examination of Norris and was prepared to testify about the contents of these records. Gatts sought to rely on him as a defense expert and to elicit testimony from him regarding the consistency or inconsistency of his findings with Norris' other treating physicians. Norris, however, objected to this and Eaton consequently refused to testify about the records. The court sanctioned Norris and instructed the jury of the circumstances surrounding Eaton's refusal to testify to medical records other than those generated by him. Norris objects to this instruction as prejudicial.

The jury found for Gatts. The court awarded $17,931.16 in costs and $46,500.00 in attorney's fees, which Norris also here contests.

Norris primarily contends that the trial court erred in refusing to instruct the jury on the doctrine of *res ipsa loquitur* and that the use and disclosure of the consumer reports was improper. For the reasons that follow, we disagree and accordingly affirm the decision of the superior court on these issues. We also affirm the superior court with respect to each of Norris' other specifications of error except that we remand the case for a redetermination of the award of costs for defense experts as explained below in Part II. F.

## II. DISCUSSION

### A. THE TRIAL COURT PROPERLY REFUSED TO GIVE A *RES IPSA LOQUITUR* INSTRUCTION.

Norris requested the trial court to instruct the jury on the doctrine of *res ipsa loquitur*. The trial court refused to give the instruction.

■ There are three prerequisites to the application of *res ipsa loquitur:* (1) the event must be of a kind which normally does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary action or contribution on the part of the

plaintiff. *Lynden Transport, Inc. v. Haragan*, 623 P.2d 789, 793–94 (Alaska 1981); *Widmyer v. Southeast Skyways, Inc.*, 584 P.2d 1, 13 (Alaska 1978).

The relevant inquiry here pertains only to the first two prongs of the foregoing test because the parties agree that Norris was not contributorily negligent.

### The Event Here was Not of a Kind Which Normally Does Not Occur in the Absence of Someone's Negligence.

■ Norris contends that since this accident was a rear-ender, it is clear that this type of accident does not normally occur in the absence of negligence. In support of her argument, Norris cites several cases in which this court has noted that under normal circumstances one who rear-ends a vehicle is generally negligent. *See Grimes v. Haslett*, 641 P.2d 813, 819 (Alaska 1982); *Hahn v. Russ*, 611 P.2d 66, 67 (Alaska 1980). Further, Norris generally notes that the use of *res ipsa loquitur* in relation to automobile accidents is commonplace.

The authorities Norris cites are inapposite. *Hahn* and *Grimes* do not apply here because both involved rear end collisions in heavy traffic where one should expect sudden stops and starts and one has reason to anticipate the conduct of the preceding driver. *Grimes*, 641 P.2d at 819; *Hahn*, 611 P.2d at 67. Here, there is no contention that Gatts was inattentive to the stopping or slowing of Norris' vehicle. All of the evidence indicates that Gatts' vehicle was careening around the parking lot out of control. The only dispute was the cause for the behavior of her vehicle. A vehicle behaving in this manner is not operating under the circumstances in which this court has recognized a resulting rear end collision to be negligent.

The doctrine of *res ipsa loquitur* is a rule founded upon inference. If the evidence discloses the circumstances of the accident to the extent that there is nothing left to infer, then the doctrine is no longer needed. *Widmyer*, 584 P.2d at 11. Here, the evidence points to the existence of a defect. This is not the type of situation which is solely explicable by the existence of someone's negligence.

In *Evans v. Buchner*, 386 P.2d 836 (Alaska 1963), we held the doctrine of *res ipsa loquitur* inapplicable, explaining that "[t]he evidence, taken as a whole, placed before the jury a fairly complete description of how the automobile was operated. Appellee explained to the best of his recollection everything that occurred prior to the overturning. Whether his explanations were adequate to absolve him of negligence was a question for the jury to determine." 386 P.2d at 837. We view the instant case similarly.[1]

The trial court properly refused to instruct the jury on this issue.

### B. THE TRIAL COURT DID NOT ERR IN ALLOWING CONSUMER COMPLAINTS TO BE USED BY GATTS AS THE BASIS FOR CROSS-EXAMINATION OF NORRIS' EXPERT AND AS UNDERLYING FACTS AND DATA UPON WHICH GATTS' EXPERT RELIED IN FORMING HIS OPINION.

#### 1. Use of Consumer Complaint Reports on Cross-Examination.

■ Norris called Hans Gelke as an expert witness. Gelke essentially testified that it was virtually impossible for an Audi 5000 to exhibit unwanted acceleration, but that if it did, the brake system was more than adequate to stop the car. He based his testimony on his training in automotive technology and his 30 years of experience with Volkswagen, the manufacturers of the Audi. It was in his capacity as a Volkswagen employee that he examined Gatts' Audi.

On cross-examination, Gatts challenged Gelke's knowledge of unwanted acceleration and brake inadequacy by inquiring whether Gelke was familiar with consumer complaint reports made to NHTSA, sixty-two of which were first reported to Volks-

---

**1.** Because our holding in this section is dispositive, we do not reach the second prong of the *res ipsa loquitur* test.

wagen (Audi) and then turned over by them to the NHTSA.

Norris contends that the trial court erred in allowing these reports to be used by Gatts on cross-examination of Gelke because these reports are hearsay, unauthenticated, irrelevant and prejudicial. We find that none of Norris' claims have merit.

Gatts was entitled to cross-examine Gelke about the extent and basis of his knowledge of the subject matter to which he would testify. *See* Commentary to Alaska R.Evid.Rule 702. Since Gelke's expertise partly derived from his employment by Volkswagen (Audi), the fact that he either was or was not aware of consumer complaints similar to Gatts' experience bears on his qualification in the area of unwanted acceleration and brake failure. The consumer reports more than meet the relevancy requirements of Alaska Rule of Evidence 401.[2] These are especially pertinent to what his experience with Volkswagen (Audi) was in this area since it had received over sixty complaints of unwanted acceleration and/or brake failures, yet Gelke was largely unaware of them.

Gatts did not seek to place these reports into evidence. They were sufficiently probative of Gelke's expert qualifications, however, to be quite properly the subject of Gatts' cross-examination.

**2.** Rule 401 provides as follows:
 Rule 401. *Definition of Relevant Evidence.*
 Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**3.** Rule 703 provides:
 Rule 703. *Basis of Opinion Testimony by Experts.*
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

**4.** Rule 705 provides:
 Rule 705. *Disclosure of Facts or Data Underlying Expert Opinion.*
 (a) *Disclosure of Facts or Data.* The expert may testify in terms of opinion or inference and give his reasons therefor without prior

**2. Use and Disclosure of Consumer Complaint Reports During Expert Testimony.**

Gatts' expert witness, Rosenbluth, used these same reports as a partial basis for his opinion that ·Audi 5000 vehicles have the potential for unwanted acceleration and that the brake system is inadequate to stop the vehicle in that situation. During his testimony, the reports were projected onto the wall by overhead projector for the jury.

The gravamen of Norris' claim here is that where the reports would be inadmissible into evidence, Gatts may not use Alaska Rule of Evidence 703[3] to import, via expert opinion, information which would be otherwise inadmissible.

Rule 703 allows an expert witness to rely on inadmissible evidence to undergird his/her opinion. Hearsay can be a permissible basis for opinion testimony. *See D.H. v. ·State,* 561 P.2d 294, 297 (Alaska 1977); *Bachner v. Rich,* 554 P.2d 430, 446 (Alaska 1976). *See also Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 505 F.Supp. 1313, 1324 (E.D.Pa.1980) (interpreting identical federal rule). The requirement of Rule 703 is that the facts and data underlying the expert's opinion must be those reasonably relied on by experts in the field. Alaska Rule of Evidence 705[4] provides a

 disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data, subject to subdivisions (b) and (c).
 (b) *Admissibility.* An adverse party may request a determination of whether the requirements of Rule 703 are satisfied before an expert offers an opinion or discloses facts or data.
 (c) *Balancing Test—Limiting Instructions.* When the underlying facts or data would be inadmissible in evidence for any purpose other than to explain or support the expert's opinion or inference, the court shall exclude the underlying facts or data if the danger that they will be used for an improper purpose outweighs their value as support for the expert's opinion. If the facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request.

mechanism for determination of "reasonable reliance" by the trial court.

### a. Rosenbluth Was an Expert.

■ Norris contests Rosenbluth's qualification by the trial court as an expert witness. This contention requires little discussion. The trial court has wide discretion in determining whether to qualify an expert witness. *See D.H. v. State*, 561 P.2d at 297; *Bachner*, 554 P.2d at 446. *See also Mannino v. International Mfg. Co.*, 650 F.2d 846, 849 (6th Cir.1981) (interpreting identical federal rule). The requirement of Alaska Rule of Evidence 702 for qualification of an expert witness is simply that the witness' special knowledge must assist the trier of fact to understand the evidence or determine a fact in issue. *See also Mannino*, 640 F.2d at 851 (holding similar requirement is applicable under Federal Rules of Evidence).

Rosenbluth was examined extensively on voir dire. His credentials were in the area of electronic engineering and computer technology. He explained that the Audi 5000 vehicle operates using what amounts to two small micro-computers. He further stated that he had experience with vehicle operating systems similar to the Audi braking system. Both NHSTA and Center for Auto Safety have recognized him as an expert in the somewhat constrained field of unwanted acceleration. Rosenbluth's qualifications recommended him to assist the trier of fact to understand the evidence. There was no clear abuse of discretion on this point.

■ As an expert witness, Rosenbluth was entitled to rely upon inadmissible evidence meeting the "reasonable reliance" criteria of Rule 703. Upon disclosure of the consumer reports, Norris requested a Rule 705(b) determination of whether the "reasonable reliance" requirement was met.

The trial court did not hold a hearing on the issue, but appears to have implicitly found the consumer reports to be reasonably relied on by experts in the field by allowing their use and disclosure to the jury. The federal counterpart to Rule 705 is interpreted to require the court to make a threshold factual inquiry to determine whether the data providing the basis of an expert's opinion is of a type reasonably relied upon by experts in the field to form such opinions when an expert's opinion is based on facts inadmissible in evidence. *Greenwood Utilities Comm'n v. Mississippi Power Co.*, 751 F.2d 1484, 1495, *reh'g denied*, 757 F.2d 284 (5th Cir.1985). We likewise view Rule 705(b) as requiring the trial court to make a determination of whether the requirements of Rule 703 have been met upon request by counsel. Such a determination provides clarity of the trial court's position to counsel and also facilitates the process of appellate review. While we would be aided in our review here had the trial court made a Rule 705(b) determination, we nevertheless decline to reverse on this point. The following discussion section demonstrates that the consumer reports meet the Rule 703 "reasonable reliance" test, and we therefore regard the trial court's inattention to the requirements of Rule 705 in this instance as harmless error.

### b. The Consumer Reports Meet the "Reasonable Reliance" Test.

In *Zenith*, 505 F.Supp. at 1330, the court set forth factors to guide a determination of the reasonableness of reliance under the federal counterpart of Rule 703. These factors are:

1. The extent to which the opinion is pervaded or dominated by reliance on materials judicially determined to be inadmissible, on grounds of either relevance or trustworthiness;

2. The extent to which the opinion is dominated or pervaded by reliance upon other untrustworthy materials;

3. The extent to which the expert's assumptions have been shown to be unsupported, speculative, or demonstrably incorrect;

4. The extent to which the materials on which the expert relied are within his immediate sphere of expertise, are of a kind customarily relied upon by experts in his field in forming opinions or infer-

ences on that subject, and are not used only for litigation purposes;

5. The extent to which the expert acknowledges the questionable reliability of the underlying information, thus indicating that he has taken that factor into consideration in forming his opinion;

6. The extent to which reliance on certain materials, even if otherwise reasonable, may be unreasonable in the peculiar circumstances of the case.

(Footnote omitted).

■ Applying these factors, we find that these consumer reports are materials which are reasonably relied upon by experts in the field. These materials could have been admitted into evidence and therefore would not even be subject to the Rule 703 test. Alaska Rule of Evidence 803(23)[5] allows the introduction of statements with circumstantial guarantees of trustworthiness into evidence as hearsay exceptions. Alaska Rule of Evidence 902[6] allows for self-authentication of these records. The reports were relevant under Rule 401[7] because Gatts was proffering a manufacturer's defect defense. It was her burden to show that the accident was caused by a design defect in her vehicle. In products liability cases (and so, by analogy here), evidence of similar accidents is admissible. *Caterpillar Tractor Co. v. Beck*, 624 P.2d 790, 794 (Alaska 1981). Because these reports were admissible, Rosenbluth's opinion was not pervaded by reliance on evidence which would have been inadmissible.

■ Even if the reports were inadmissible, they were not untrustworthy or unreliable. They were not compiled in anticipation of litigation. They were honest representations of consumers who had nothing to gain by reporting automobile defects similar to that allegedly encountered by Gatts. Given the number and spacing of the reports, there was obviously no collusive aspect to them.

Rosenbluth's opinion was not dominated or pervaded by these materials. His testimony only partially rested on them. He also used his personal experience and training as well as the actual inducement by himself of an Audi runaway situation.

There was no showing on cross-examination that Rosenbluth's assumptions were unsupported, speculative or demonstrably incorrect.

These materials were within Rosenbluth's immediate sphere of expertise as an expert on unwanted acceleration and its causes. It is difficult to imagine how an

---

**5.** Rule 803(23) provides:

Rule 803. *Hearsay Exceptions—Availability of Declarant Immaterial.*

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

....

(23) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (a) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

**6.** Rule 902 provides in part:

Rule 902. *Self-Authentication.*

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

....

(4) *Certified Copies of Public Records.* A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any enactment of the Alaska Legislature or other rule prescribed by the Alaska Supreme Court.

(5) *Official Publications.* Books, pamphlets, or other publications purporting to be issued by public authority.

**7.** *See supra* note 2 and accompanying text.

expert in this field would form an opinion on the potential for Audi runaways without partial reliance on some statistical data of this kind. Partial reliance on these materials is reasonable in the circumstances of this case.

There was no acknowledgment by Rosenbluth that the consumer reports were of questionable reliability. Neither did Norris make that claim. Her claims instead are aimed at technical inadmissibility on the grounds of hearsay, irrelevancy, nonauthentication and prejudice.

Finally, no peculiar circumstances exist here which render Rosenbluth's reliance on the reports unreasonable.

When the reports were to be disclosed to the jury, the trial judge gave a limiting instruction as required by Rule 705(c), admonishing the jury as follows:

THE COURT: Ladies and gentlemen, apparently Mr. Rosenbluth is going to use some visual aids by way of overhead projector. These relate to some complaints, consumer complaints to the National Highway Traffic Safety Administration which I believe you've heard something about before during the testimony of another witness.

I would instruct you at this time that the matter contained in those reports is not admissible evidence, and it is in effect hearsay, it's not being shown to you for purposes of establishing the truth of the matters contained in those individual reports, but rather is a matter that Mr. Rosenbluth took into account in reaching his asserted opinions in this matter.

Rule 705(c) requires the trial judge to exclude underlying facts which would be inadmissible in evidence if the danger that they will be used for an improper purpose outweighs their value as support for the expert's opinion. The trial court did not explicitly consider excluding these materials on the record. This does not amount to reversible error, however, because, as noted, the evidence was admissible and as such would require no inquiry into exclusion. Furthermore, the trial judge complied with the remainder of Rule 705(c) in giving a prophylactic limiting instruction admonishing the jury not to take the materials for the truth of the matter asserted because they were not being admitted.

In conclusion, because the reports at issue pass muster under the *Zenith* test of "reasonable reliance" and a limiting instruction was given, these materials were properly allowed to serve as a partial basis for Rosenbluth's opinion testimony and were properly disclosed to the jury during that testimony.

### 3. The Use of the Consumer Reports and Unfair Surprise to Norris.

■ Norris argues that she was unprepared to cross-examine Rosenbluth regarding the consumer reports underlying his testimony because she was not provided with these documents prior to Rosenbluth's examination.

Norris does not apparently contest any ruling of the trial court with respect to compelling disclosure of these reports in discovery. Rather, she cites us to a section of the transcript.[8] This colloquy evinces no

---

8. MR. MESTAS: Your Honor, could I request that the witness at least show the name so that I can check my documents?
BY MR. BARRETT:
Q. Yeah, why don't you read the name—
A. In many cases the name is missing. NHTSA's records, as they supplied them, omits the names and addresses. Now you may have a record where they have the name and address; those came early in '85, but not in '86. Okay.
MR. MESTAS: I'd like the record to reflect then the witness is using a document that was never given to me by Mr. Barrett and that I've been unable to check or verify in any way. The one that I have has names.

MR. BARRETT: This is a public record, Mr. Mestas can call NHTSA and get his own copy.
MR. BARRETT: This is just an updating, a recent updating of the prior NHTSA records.
THE COURT: Are these the same records that we've already heard talked about?
THE WITNESS: They're from the same source and they're probably 95 percent identical. Mr. Barrett obtained his records in December of 1985, I made a request on December 25th, 1985 for the identical data that Mr. Barrett has and I received mine in late February, okay, and that's what you're seeing. That's why Mr. Barrett's list has names and mine doesn't have names.
THE COURT: Okay, and—

clear objection to the use of these reports by Rosenbluth on these grounds. While Norris' counsel questioned the use of the documents at first, he indicated that an explanation of a discrepancy in them was "all right," and no further objection was raised during the testimony on this ground.

At this stage of the trial, discovery had been supplemented and Norris informed that Rosenbluth's opinion would be based on this evidence, and Gatts had utilized several of these reports during cross-examination of Gelke. Norris was on notice that these reports would be utilized and the record is replete with objections to them long before Rosenbluth disclosed them to the jury. The reports are public records and easily obtainable. This claim has no merit.

## C. THE TRIAL COURT DID NOT ERR IN ALLOWING A VIDEOTAPED SIMULATION OF UNWANTED ACCELERATION OF AN AUDI TO BE SHOWN TO THE JURY.

 Rosenbluth induced an unwanted acceleration in an Audi 5000, the same make as the Gatts vehicle, and recorded it on videotape. The videotape was shown to the jury, and contrary to Norris' assertions, the brakes did not stop the vehicle.

Norris objected to the videotape on the grounds that it was an attempted re-creation of the accident.

The trial court ruled that the videotape could be shown to the jury, noting that it was not a re-enactment of the accident but rather that it was admittedly an experiment conducted under different circumstances and that the differences would be adequately explained to the jury. The court instructed the jury as follows:

> Then ladies and gentlemen, the video tape that you'll see is not intended to be a re-enactment of the accident. It's intended as an example of what Audi 5000S vehicles may do under engine run-

THE WITNESS: So far as I know it's obviously from the identical NHTSA data base which is kept at the National Institutes of Health, I might add.

away conditions, in attempted straightaway and attempted swerving stops.

The trial court's colloquy with Norris' counsel and its ruling occurred within the context of allowing the use and disclosure of the videotape to the jury as a basis for Rosenbluth's expert opinion.

Norris agreed to the instruction and did not object later when the videotape was actually admitted as an exhibit. Norris now attacks the videotape claiming that (1) the vehicle is dissimilar from the accident vehicle; (2) the testing conditions were dissimilar from the accident conditions; (3) records of testing were inadequate; and (4) the test instruments were not calibrated.

The videotape documented the response of an Audi 5000 in an induced situation. The fact that Rosenbluth had performed the experiment led to his knowledge of the results. This was part of his own personal experience to which he was free to testify. The videotape simply demonstrated that experience for the jury.

In light of the limiting instruction and the in-depth explanation offered by Rosenbluth regarding the similarities between the accident vehicle and the exemplary vehicle and the test conditions, we cannot say that it was error to allow the videotape into evidence.

## D. CROSS–EXAMINATION OF ROSENBLUTH.

Norris contends that the trial court erred by restricting the scope of cross-examination of Gatts' expert witness, Mr. Rosenbluth.

 On direct examination, Rosenbluth opined that Gatts' automobile had a jammed throttle which caused the unwanted acceleration of her vehicle and her brake system failed to halt her vehicle. He based his view partly on his own successful inducement of an engine runaway in an Audi 5000 vehicle, and partly on his review of various statements recounting the accident

MR. MESTAS: I just wanted that so I could figure out which one he's talking about. . . .

and the testimony at trial. On cross-examination, Norris asked two questions to which Gatts objected. The first question posed to Rosenbluth was whether he understood there to have been a wood pile at the accident scene which Gatts' vehicle came to rest on or against after the accident. Gatts objected to this question on grounds of relevance and on the ground that it was beyond the scope of direct examination. The court sustained the objection. The second question posed to Rosenbluth was whether he was familiar with a statement by an eyewitness (Mr. Rudolph) that he could not recall seeing Gatts' brake lights come on, and what effect that statement had in formulating his opinion. This question was also objected to on the ground that it was beyond the scope of direct examination.

In our view, Rosenbluth's direct testimony included an opinion as to what happened to the Gatts vehicle. Therefore, these two questions were properly the subject of Norris' cross-examination of Rosenbluth and the trial court erred in sustaining Gatts' objections to them as being beyond the scope of direct examination. We view this error as harmless, however, and decline to reverse on this point.

 The objection to the first question was properly sustained on grounds of relevancy. It is not important what type of object the vehicle came to rest against after the accident. The second question was actually answered by Rosenbluth. He stated that he took Rudolph's statement to be indeterminate as to the issue of whether or not the brake lights came on. Therefore, there was no reversible error in the trial court's restriction of Gatts' cross-examination of Rosenbluth.

### E. COSTS IN RELATION TO THE EATON DEPOSITION.

 Norris contends that the trial court erred in awarding Gatts $1,000.00 in costs in redeposing Dr. Eaton because Eaton, a physician hired by Norris for a second opinion, was wrongfully retained as an expert witness for Gatts, and that his testimony violated the fiduciary nature of his relationship to Norris.[9]

The trial court addressed these contentions and, on the basis of *Trans-world Investments v. Drobny*, 554 P.2d 1148 (Alaska 1976) and *Arctic Motor Freight, Inc. v. Stover*, 571 P.2d 1006 (Alaska 1977) found these contentions groundless. The court sanctioned Norris and awarded the additional $1,000.00 for a second deposition.

In *Mathis v. Hilderbrand*, 416 P.2d 8 (Alaska 1966), and later in *Trans-world* and *Arctic*, we found that the filing of a personal injury action waives the physician-patient privilege as to all information concerning the health and medical history relevant to the matters which the plaintiff has put in issue. The scope of the waiver extends to all matters pertinent to the plaintiff's claim, including but not limited to those matters the relevancy of which is based on historical or causal connection. Further, the court indicated that relevancy here was to be interpreted in light of Alaska Rule of Civil Procedure 26(b)(1).[10] *Trans-world*, 554 P.2d at 1151; *Arctic*, 571 P.2d at 1008–09.

Viewing Gatts' request of Dr. Eaton to testify regarding the consistency or inconsistency of his findings with the diagnosis of Norris' other treating physicians in this light, these questions appear well within the permissible scope of relevancy based on historical or causal connection for purposes of cross-examination in this case. Thus,

---

**9.** At the outset of this discussion we note that we do not here consider Norris' contentions that the trial court erred in sanctioning Norris' counsel in relation to the Eaton deposition or in issuing a limiting instruction to the jury regarding the circumstances of that deposition. These issues were raised in Norris' brief, yet they relate only to damages and are not necessary to review in light of our affirmance of the judgment on the verdict. We now consider the issue of the propriety of the costs awarded by the trial court in relation to the Eaton deposition.

**10.** Rule 26(b)(1) provides in pertinent part:
It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

the trial court's finding and sanctions against Norris are well justified especially in view of the fact that Gatts would foreseeably either have been deprived of Eaton's testimony or forced to assume the cost because of Norris' spurious claim.

It is well established in this state that the award of costs for depositions is in the sound discretion of the trial judge. *See Kaps Transport, Inc. v. Henry,* 572 P.2d 72, 79 (Alaska 1977); *Beaulieu v. Elliott,* 434 P.2d 665, 678 (Alaska 1967). The costs assessed were not unreasonable. The trial court did not abuse its discretion.

## F. AWARD OF COSTS FOR DEFENSE EXPERTS.

■ Essentially, Norris contests the amounts awarded here in costs for expert witness fees under Alaska Administrative Rule 7(c)[11] as being greater than those allowed by the rule.

A review of the Bill of Costs filed by Gatts shows that the expert witness expenses were not broken down by hour. These expenses were considered by the trial court and sums awarded with no inquiry into the number of hours each witness had expended while employed and testifying as an expert, as required in order properly to award no greater than $25.00 per hour according to Rule 7(c).

In *Hayes v. Xerox Corp.,* 718 P.2d 929, 940 (Alaska 1986), we found that it was impossible to determine on review whether or not the requirements of Rule 7(c) were met since no hourly breakdown was provided. We remanded the item of costs to the superior court to redetermine according to the mandate of Rule 7(c). *Id.* We do the same here. Gatts argued that Alaska Civil Rule 79(b), which provides for recovery of "expenses necessarily incurred in order to enable a party to secure some right accorded him in an action or proceeding" makes an award of expert witness fees in excess of the $25.00 per hour authorized by Rule 7(c) permissible. We caution the trial court that it does not. *See Miller v. Sears,* 636 P.2d 1183, 1195 (Alaska 1981).

## G. ATTORNEY'S FEES.

■ Norris contends that the court awarded fees under Alaska Rule of Civil Procedure 82(a)(1) without verification in violation of the *Hayes* rule and that of *Fairbanks North Star Borough v. Tundra Tours, Inc.,* 719 P.2d 1020 (Alaska 1986). She further contends that the amount awarded was unreasonable. Both of these cases were rulings of this court on the propriety of awarding attorney's fees under the presumptive fee schedule.

In *Hayes,* the court stated that "when counsel requests attorney's fees, other than based on the schedule in Rule 82(a)(1), accurate records of the hours expended and a brief description of the services reflected by those hours should be submitted." 718 P.2d at 939. However, this court held in *Fairbanks* that it has "affirmed awards consistent with the Rule 82(a)(1) schedule where they do not include an itemization of cost." 719 P.2d at 1037. There, the court found no error in awarding attorney's fees according to the presumptive schedule where the party requesting fees submitted a memorandum supporting her motion and discussed the fee arrangement at hearing. *Id.; see also Kaps Transport, Inc. v. Henry,* 572 P.2d 72, 76 (Alaska 1977).

This case does not allow use of the presumptive fee schedule of Rule 82(a)(1). Rather, where no recovery was had, Rule 82(a)(1) requires the trial court to fix the attorney's fees, in its discretion, in a reasonable amount, the purpose being "to provide partial compensation to a prevailing party." *Atlantic Richfield Co. v. State,* 723 P.2d 1249, 1252 (Alaska 1986).

Gatts' memorandum in support of her motion for attorney's fees stated:

> The trial in this matter lasted seven days. Mrs. Gatts' exposure, as pled in

---

11. Rule 7(c) provides in pertinent part:

 (c) *Expert Witnesses.* A witness called to testify as an expert shall receive additional compensation to be fixed by the judge with reference to the value of the time employed and the degree of learning or skill required; but such additional compensation shall not exceed $25.00 per hour while so employed and testifying, except as otherwise provided in these rules.

the Complaint and argued by counsel in closing arguments, could be fairly estimated to be between $300,000 and $500,000.... [A]nalysis of the case, development of the defense, trial preparation and actual trial time was 342.5 hours for lawyers from the law firm of Call, Barrett & Burbank performed since they received the case in November of 1985. An additional 197.85 hours of professional services was rendered by the law firm of Hughes, Thorness, Gantz, Powell & Brundin for the initial defense of the case until November of 1985, and 41.3 hours of professional services was rendered by the law firm of Faulkner, Banfield, Doogan & Holmes. At the fees charged by each professional who worked on this case, the total attorneys' bill incurred by Mrs. Gatts for the defense of this matter through March 19, 1986 is $62,718.25.

An affidavit of counsel was provided restating these hours and indicating that costs were not included. This affidavit also stated:

Detailed documentation to support these fees is available to the court and counsel on request.

Where, as in *Fairbanks* and *Kaps,* the memorandum in support of the motion for attorney's fees discussed the fees in this detail and Norris failed to request a more detailed itemization, the trial court properly awarded a reasonable amount based on the information before it.

This court will interfere with the trial court's exercise of discretion under Rule 82 only where there is an abuse of that discretion. *Fairbanks,* 719 P.2d at 1037. Such abuse is established where the determination was manifestly unreasonable. *Palfy v. Rice,* 473 P.2d 606, 613 (Alaska 1970). No manifest unreasonableness occurred here.

### III. CONCLUSION

For the foregoing reasons, we REVERSE and REMAND the case in part on the issue of costs under Alaska Administrative Rule 7(c), directing the superior court to redetermine the costs for expert witness fees according to their hours spent while so employed and testifying. Otherwise, the judgment of the trial court is AFFIRMED.